IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD JENKINS,

    Petitioner,                    No. CIV S-08-3082 GGH P

    vs.

JAUQUEZ, Warden,

    Respondent.             ORDER

_____/

*Introduction and Summary*

        This habeas petition, before the undersigned pursuant to the consent provisions of 28 U.S.C. § 636(c), involves issues of double jeopardy and use of gang evidence. Petitioner asserts in the amended petition that he cannot be convicted of both assault with a deadly weapon enhanced for causing great bodily injury, and, at the same time, battery causing serious bodily injury, i.e., the latter is subsumed by the former. While petitioner's point is intuitively colorable, the Court of Appeal opinion and respondent's well written briefing again demonstrate that outcomes in the law are not always what they seem they should be on the surface. The double jeopardy claim should be denied. The gang evidence claim does not warrant relief in habeas corpus.

        The habeas petition is therefore denied in its entirety.

*Background*

The parties do not contest the accuracy of the rather brutal substantive facts of the crime as set forth by the Court of Appeal as those facts are not directly pertinent to the outcome here. These background facts are therefore set forth as they appear in the appellate opinion.

A. The Assaults

In August 2004, Seeva and Steven Cherms FN2 were looking for their 15-year-old daughter, Hailey, who had run away from home. On August 13th, Steven received a telephone call advising him that his daughter may be at a certain apartment complex off of Edison and Howe Avenue in Sacramento County. The complex was in the same area the Cherms had lived in 25 years earlier.

FN2. In the interests of clarity, we shall refer to Mr. and Mrs. Cherms by their given names and intend no disrespect.

Joshua, a friend of theirs, drove the couple to the apartment complex in his sport utility vehicle (SUV). He parked across the street from an apartment complex on Edison Avenue and he and Steven walked up to the iron gate. Just as the manager opened the gate for them, Steven thought he saw his daughter walking down the street and shouted to Seeva, "hey, that looks like Hailey right there."

Seeva exited the SUV and followed Steven, but then looked back and saw two people in the SUV, a young adult later identified as defendant and a 12 to 14-year old juvenile. Seeva could see defendant trying to start the vehicle and shouted for Steven because many of their valuable personal belongings, contained in several bags, were in the SUV. FN3 Defendant and the juvenile took the bags and ran between the apartments.

FN3. Because Steven was in the process of changing banks when he went to look for his daughter, the entire contents of the Cherms' safe deposit box were in the SUV that day.

As Seeva walked towards Howe Avenue looking for defendant and the juvenile, she asked a man and woman who were standing near the corner if they had seen where the two males had gone with her bags. The couple was cordial but told Seeva her belongings were gone and advised her to "write it off." Seeva called 911 from her cellular phone to report the theft. After she made the call, the woman told her the "kid" had gone in the direction of Howe and Edison and pointed out an apartment complex where the stolen property would be unloaded.

Meanwhile, Joshua picked Seeva up in the SUV and drove down Howe Avenue looking for defendant and the juvenile. Unable to find them, he drove back to the apartment complex and parked the SUV in front of the Royal Gardens Apartments on Howe Avenue. Seeva exited the vehicle and saw Steven walking towards her. Meanwhile, a group of about 10 individuals had gathered nearby, all wearing white T-shirts and jeans. As the group started to approach the Cherms, Seeva recognized defendant as the person who tried to take the SUV. When he stepped

toward her in a threatening manner, she realized she was in danger, took a step back, and told him she had no problem with him, she was just trying to retrieve her belongings. FN4

FN4. Seeva identified defendant in court as the adult who tried to steal the SUV and then assaulted her. Steven also identified defendant in court as the one who hit him in the face.

At that time, Steven approached and Seeva told him they should wait for the police, however defendant pushed her to get to Steven who was bewildered and backing away. At the same time, defendant also began giving orders to the other males in the group, directing some to take the SUV and telling others to make sure Steven did not go anywhere. When Steven was surrounded, a male known as J-Mack hit him in the head, followed by defendant, who hit him using what appeared to be homemade brass knuckles. Defendant struck Steven in the temple and eye and than hit him in the right cheek, causing Steven to stumble and fall to the ground.

Seeva began yelling, "Stop, he's disabled ... [h]e doesn't want to fight you. He wants nothing to do with this. Stop. Please stop." Hoping to scare them, she also told the group "the police are on their way." Undeterred, defendant walked towards her, smiled, showing gold teeth, and then hit her in the face with his fist. The blow knocked her off her feet, causing her to fall to the ground and lose consciousness. Defendant ran away, but 15-year old Terrance C. (hereafter Terrance) began kicking her in the head and stomping on her stomach and the left side of her body. In an effort to protect his wife, Steven ran over to Seeva and lay on her, suffering a few additional kicks before the police arrived.

When Seeva regained consciousness, she felt searing pain in her head and her sides. She had difficulty breathing and was intubated and taken by ambulance to the hospital where she spent a week. She had a dislocated jaw, a closed head injury associated with amnesia and loss of consciousness, a fractured rib, and bruising around her ribs and back. Dr. Owens, director of the Mercy San Juan Trauma Center, characterized her injuries as "moderately severe" and consistent with a "rather significant" beating.

As a result of the beating, Steven sustained a "giant retinal tear" and "traumatic vitreous hemorrhage" in his right eye. He underwent surgery on August 27, 2004, to re-attach his retina and will require two or three additional surgeries. At the time of trial, he had no actual sight in his right eye and his visual prognosis was guarded due to the severe trauma to his eye. The blows to his face also broke two of his teeth and knocked the shell of a recent root canal and temporary filling out of his mouth.

B. The Investigation

Terrance advised law enforcement officers that after the Cherms confronted defendant and another friend about taking their property, defendant punched the man in the face a couple of times and when the woman yelled at defendant, he turned and punched her in the face, causing her to fall. Terrance refused to give the deputy any further information about his two friends because he was scared

they would kill him if he did.

On September 1, 2004, Ken Silva, defendant's probation officer, went with his partner and a detective to defendant's address. When they arrived, Silva saw defendant standing outside. When they made eye contact with him, he ran away. Later that day, Silva was asked to identify a patient at Kaiser Permanente Medical Center who was giving a false name and was believed to be defendant. Silva identified defendant who was sitting in the emergency room with a heavily bandaged arm. He was awaiting surgery. Defendant told Silva he cut his arm on a fence he jumped over while running from Silva earlier that day.

The following day, on September 2, 2004, defendant agreed to speak with Detective Rivera. He told Rivera the Cherms approached him and accused him of taking their property. Steven became verbal with him, punched him in the face, and a fistfight ensued. Defendant denied hitting Seeva but said Terrance was present.

C. The Gang Enhancement

Defendant and Terrance are both members of the street gang known as the Del Paso Heights Bloods (DPH Bloods). Terrance carved the letters "DPH" in his arm because it was a "gang thing" and showed he was from Del Paso Heights.

Detective Elaine Stoops of the Sacramento County Sheriff's Department gang unit testified as an expert on gang psychology and gang-related crime. The DPH Bloods are a gang with over 200 validated members in the northern area of Sacramento County. The letters DPH are a symbol commonly used to signify that gang and are used by gang members as a verbal challenge. The gang has been present in the Del Paso Heights area since the late 1980's and gang members have been seen in the area of the Royal Gardens Apartments, which is within a couple of miles of Del Paso Heights.

To be a validated member, an individual must meet two of 10 standard criteria and have been an active gang member within the last five years. Members of the DPH Bloods frequently engage in the sale of narcotics, robberies, drive-by shootings, and homicides.

According to Detective Stoops, defendant has been a validated member of the DPH Bloods since February 2003. The validation was based upon a field contact by Deputy Jaymon Martinez, at which time defendant admitted he was a member of that gang while he was in the company of two other validated gang members and was wearing red clothing, the color associated with the DPH Bloods. Additionally, he had committed a gang-related crime, which may be a crime involving narcotic sales, arson, robbery, drive-by shootings, or homicide.

According to Stoops, a gang member's whole livelihood is about respect and disrespect. Gang members want and expect others to "respect" them, meaning to fear them. Gang members do not like to be labeled as snitches and a snitch can expect severe retribution from other members in the form of a "beat down" or shooting. A "beat down" occurs when the gang surrounds a person and beats the person up until he or she goes down and is no longer moving or causing the gang

4

a problem. Some of these beat downs result in homicide.

Committing a theft and participating in a beat down as in the present case benefits a gang member by bolstering his status in his gang and other gang sets and reinforces the fear and intimidation of the community. Other members of the community are reluctant to speak to law enforcement authorities because they fear reprisal from gang members.

Males as young as seven are brought into the gang because they are naïve and impressionable and are willing to do what they are told without asking a lot of questions. Older gang members test young males by ordering them to do various acts in the commission of a criminal offense to prove their trustworthiness and loyalty to the gang.

Stoops also testified that Charles Yerger and William Fields are validated members of the DPH Bloods, that in October 2002, Yerger made a threat to commit a crime resulting in great bodily injury or death (§ 422) for which he was charged and convicted with a gang enhancement (§ 186.22), and that Fields suffered two prior convictions for assault with a firearm sometime in December 2002 or 2003.

D. Defense

Defendant took the stand, denied he was a gang member, and testified he was acting in self-defense when he hit Steven Cherms. According to defendant, the day of the attack, he went to the Royal Gardens Apartments with his girlfriend to visit friends. While they were sitting in front of the apartment complex, he heard a lot of yelling, which drew his attention to a white couple. The man was upset and was yelling at some kids saying "You little bastards, where's my stuff at?" while the woman was pointing at people. The woman approached him, pointed at him and said "He's one of the ones that took my property." When the man started yelling at him, defendant stood up and said he did not know what they were talking about. The man hit him in the face and a fight ensued. Defendant stopped fighting when his girlfriend pulled him away and he went back into the apartment complex. He left the area a short time later when his ride arrived. At that time, the man and the woman were both standing on their feet yelling at the kids. He never hit the woman and never saw anyone else hurt her.

People v. Jenkins, 48 Cal. Rptr. 3d 904, 906-909 (Cal. App. 2006).

*Procedural Facts*

Petitioner was convicted:

Count 1-- battery with serious bodily injury (Seeva Cherms);

Count 2– assault with a deadly weapon (Seeva Cherms) enhanced by Cal. Penal Code § 12022.7 (felony with great bodily injury);

Count 3– battery with serious bodily harm (Steven Cherms);

Count 4– assault with a deadly weapon (Steven Cherms) enhanced by Cal. Penal Code § 12022.7 (felony with great bodily injury).

All counts were also enhanced by the criminal street gang enhancements applicable in California law, Cal. Penal Code § 186.22(b)(1). In total, petitioner was sentenced to 22 years and 4 months. The sentence was imposed as follows:

Count 4 – the upper term of four years was imposed with a three year great bodily harm enhancement plus ten years for gang related activity. (17 years).

Count 3 – the midterm of three years was imposed with a five year gang enhancement, but the sentence was stayed pursuant to Cal. Penal Code § 654 (0 years).

Count 2 – one-third of the midterm (1 year), plus an enhancement of one year for great bodily injury, plus three years and four months for gang related activity, all consecutive to Count 4 (5 years four months).

Count 1– Three year midterm imposed and a five year gang related activity enhancement to run concurrent. (The Court of Appeal found that this count should have had a stayed sentence to comply with California law and ordered such) (0 years).

Except as noted above, the Court of Appeal affirmed all aspects of the conviction and sentence. Review in the Supreme Court of California was initially granted on the issue of whether enhancement allegations constituted an element of the offense for purposes of lesser included offense analysis. However, this issue was thereafter decided by People v. Sloan, 42 Cal. 4th 110 (2007), and People v. Izaguirre, 42 Cal. 4th 126 (2007), and the review in this case was dismissed and remanded without instruction, i.e., the California Court of Appeal had correctly anticipated the outcome of the two state supreme court cases, or at least had arrived at the right result via another analysis.

*Issues*

1. Petitioner's battery convictions violated the Double Jeopardy Clause;

2. [same as the first ground further asserting that the battery convictions were lesser included

1  offenses of the assault with a deadly weapon and great bodily injury enhancement]
2  3. Failure to bifurcate the gang enhancement violated due process.
3  *AEDPA Standards*

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the

objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

\\\\\

\\\\\

*Discussion*

<u>Double Jeopardy</u>

The discussion of double jeopardy commences with clearly established law. Double jeopardy can occur in three situations: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. <u>Brown v. Ohio</u>, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225 (1977). The first two situations are not in play here, only the third is pertinent. <u>Blockburger v. United States</u>, 284 U.S. 299, 304, 52 S.Ct. 180, 182 (1932), supplies the rule for the "same offense" situation: if the same act or transaction constitutes a violation of two distinct statutory provisions, double jeopardy will be violated if each of the two statutes do not require proof of a fact [element of the crime] different from one another.

Viewing the substance of the charges here along with their attached enhancements (which had to be pled and proved to the jury), petitioner argues that assault with a deadly weapon causing great bodily injury (the greater crime) necessarily includes all substantive aspects of the lesser crime – battery with serious bodily injury. And, in a universal sense this is true. While not all assaults with a deadly weapon involve a battery, an assault with such weapon actually causing great bodily injury must, by definition, involve a battery causing serious bodily injury. However, under California law enhancements are not part of the substantive offenses for the state rule prohibiting multiple convictions based on necessarily included offenses. This was the holding of both <u>People v. Sloan</u> and <u>People v. Izaguirre</u>. It follows that this federal court cannot find that the state supreme court is "wrong" in the way it defines the elements of its offenses, <u>Brown v. Ohio</u>, 432 U.S. at 167, 97 S.Ct. at 2226, and that the assault with a deadly weapon charge per se was not the "same state offense" as battery with serious bodily injury. [1]

---

[1] The Court of Appeal did not expressly rule on the federal double jeopardy issue. After reviewing federal law, it went on to hold that the California protections in Cal. Penal Code § 654 were broader than federal protections, and that the state protections were not violated because the sentences for the lesser offenses had been stayed, i.e., no punishment was actually imposed.

1    There is a bit of form over substance here because, as recognized above, in light
of the convictions and facts found true, the universe of tasks for the jury to perform in this case
required that the jury find all of the facts for the assault with a deadly weapon/great bodily injury
enhancement which would have necessarily included the same facts as found for the battery with
serious bodily injury counts. And, it is an open question for double jeopardy purposes whether
an imposed, but stayed punishment, is no punishment at all for federal purposes. See United
States v. Davenport, 519 F.3d 940, 947 (9th Cir. 2008) (concurrent sentences can violate double
jeopardy); United States v. Palafox, 764 F.2d 558, 564 (9th Cir. 1985) (en banc) (judgment as
well as sentence may need to be stayed to avoid double jeopardy).[2]

Indeed, in a somewhat analogous situation, the Supreme Court in Simpson v.
United States, 435 U.S. 6, 98 S.Ct. 909 (1978),[3] held that double jeopardy precluded the
imposition of dual punishments for violating the enhanced robbery statute, 18 U.S.C. § 2113(d)
(robbery committed by the use of a dangerous weapon or device), and 18 U.S.C. § 924(c) which
enhanced a sentence for any felony committed with a firearm.[4]

Thus, respondent was correct in further arguing the point that when a legislature
*intends* that double punishment be imposed, no double jeopardy violation takes place. Missouri
v. Hunter, 459 U.S. 359, 103 S.Ct. 673 (1983). See also United States v. Beierle, ((cited at n. 3)
where it recognized that Congress expressly amended the criminal statute at issue to show its
intent to permit double punishment). While the issue here is somewhat clouded in that the

---

[2] That is, the undersigned is unaware of any Supreme Court authority reasonably on point which would be necessary to have an AEDPA resolved point of law. Moreover, in a real world sense, a sentence which imposes, in effect, "0" time imposes no punishment. The Double Jeopardy Clause should focus on real world situations and not theoretical ones.

[3] Superseded by statute, see United States v. Beierle, 77 F.3d 1199,1201 (n.1) (9th Cir. 1996). More will be said about this in the text.

[4] In other contexts, enhancements are not given double jeopardy status. See e.g., Monge v. California, 524 U.S. 721, 118 S.Ct. 2246 (1998) (retrial of enhancement dismissed for insufficient evidence by the Court of Appeal could be tried again.). (The area of double jeopardy and enhancements is somewhat non-symmetrical).

Legislature ultimately did not desire double punishment, see Cal. Penal Code § 654, but only double convictions, see Cal. Penal Code § 954, the intended double punishment exception to double jeopardy is the ultimate reason why petitioner's double jeopardy argument fails.

There is no doubt that the "lesser" crime itself directly punishes a battery with serious bodily injury more severely than a battery which does not cause such injury. Cal. Penal Code § 243 (a) and (d). This consequence must have been known to the legislature when it generically enhanced the penalty for felony crimes whose commission could and did result in great bodily injury – assault with a deadly weapon being one of them. Cal. Penal Code § 12022.7 (terms of imprisonment for persons inflicting great bodily injury while committing or attempting felony). Indeed, the legislature understood there were crimes whose elements contained their own enhancement for bodily injury, and it expressly excluded them from the generic enhancements, § 12022.7(g). Thus, the legislature knew there could be circumstances where both a crime with an element of great (serious) bodily injury could exist alongside a crime whose elements did not contain this bodily injury proscription, but whose commission could be enhanced by § 12022.7.[5] This stands as intention enough for the undersigned to conclude that the legislature intended multiple punishments could be imposed (or at least convictions entered for conviction purposes before a stayed sentence was pronounced) for the acts encompassed by two statutes.

It is true that Cal. Penal Code § 654 generally prohibits multiple punishments for the same acts, and one could argue from this that the California Legislature *never* intends multiple punishments. However, as recognized by the Court of Appeal this proscription is broader than the double jeopardy protections. In any event, no clearly established Supreme Court authority speaks to the situation where a state legislature clearly intends the recordation of double convictions for the same offense, Cal. Penal Code § 954, but ultimately does not desire the

---

[5] There is no distinction in California law between "great" and "serious" bodily injury. Sloan, supra, 42 Cal. 4th at 117.

11

imposition of double punishments, § 654.

Finally, the undersigned agrees with respondent that the Supreme Court has not made an express finding that Apprendi v. United States, 530 U.S. 466, 120 S.Ct. 2348 (2000), applies to double jeopardy issues, and therefore cannot be utilized to overturn a conviction based on that principle. Moreover, the undersigned also does not understand how Apprendi and its progeny could have been violated here. With respect to the assault with a deadly weapon charge, the jury found all elements beyond a reasonable doubt. Regardless of how it was labeled, the jury also found beyond a reasonable doubt the truth of the charged enhancement of great bodily injury. Apprendi requires nothing more.[6] See Sattazahn v. Pennsylvania, 537 U.S. 101, 111, 123 S.Ct. 732, 739 (2003).

<u>Non-Severance of Gang Enhancement Evidence</u>

The undersigned commences this discussion by observing what is not at issue. Petitioner makes no complaint that the gang evidence was insufficient to sustain a gang enhancement under Cal. Penal Code 186.22. He merely complains that the evidence should not have been permitted in the guilt phase of the trial as it was not relevant and/or was unduly prejudicial to the outcome of the guilt case. Thus, one must determine whether it was appropriate to have any gang evidence in the liability phase and, if so, whether the particular evidence of gang activity was not in itself so prejudicial that it should not have been heard in that phase.

Federal law on the subject of not severing other parties or criminal activity from the trial of a criminal offense is generally the same:

---

[6] Apprendi stands for the proposition that any fact which enhances a sentence beyond the maximum provided by the criminal statute at issue must have that fact proved to a jury beyond a reasonable doubt. It does not mandate that all enhancements are procedurally, formally labeled within the elements of an offense, although that may be the substantive effect of Apprendi. This is especially true where the petitioner herein argues that gang enhancements, for example, should have been bifurcated from the liability case elements. Obviously, in this context, not all enhancements can be viewed as formal elements of the underlying offenses themselves.

> "[T]he propriety of consolidation rests within the sound discretion of the state trial judge." *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir.2002). Thus, we will not grant habeas relief unless the joinder "actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.2004) (citation omitted); *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir.1998). "The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (internal quotation marks and citation omitted).

Comer v. Schiro, 480 F.3d 960, 985 (9th Cir. 2007).[7]

Or, as respondent briefed the issue, the key finding to be made by the habeas court is whether introduction of the evidence in the main case was "fundamentally unfair," citing Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).

In reviewing whether severance, i.e., bifurcation, was necessary one looks to such things as the admissibility and importance of the evidence sought to be bifurcated from the main case to the issues remaining in the main case, whether evidence on the issue sought to be bifurcated was inextricably intertwined to the issues left to be tried in the main case, and whether the evidence sought to be bifurcated was unduly inflammatory in light of the degree of relevance.

Trial counsel requested that the evidence related to gang enhancement, set forth above, be tried in a separate proceeding. The trial court denied the motion and explained:

> The conduct that's alleged, the reason for the crime, the resulting thieves, whose conduct inflicted what blow, the motive, as I stated, for crimes. All of those things I think [ ] counsel mentioned are inextricably intertwined, if you will, in the case such that it would make no sense to prosecute the case and not tell the jury why this group of young men would assault these people just out of the blue.
> The victims were just driving up, have their possessions loaded in the vehicle and are swarmed by the defendant and the others.
>
> And I would note that defendant is alleged– he's 20. The others are juveniles. He's the older and it's the People's theory of the case that he is the leader of the group. And, thus, it would explain what's occurring and the reasons behind the actions.

RT (augmented) 7-8.

---

[7] However, there may well be greater efficiency concerns involved in a joinder of parties situation as opposed to simply bifurcating the issues in a trial.

\\\\\

In pertinent part, the Court of Appeal reasoned:

In *People v. Hernandez, supra,* 33 Cal. 4th 1040, the court held that section 1044 provides the trial court within discretion to bifurcate the trial of the charged offense from the trial of the gang enhancement allegation....
The court in *Hernandez* explained that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation–including evidence of the gang's territory, membership, signs,... can help prove identity, motive, modus operandi, specific intent, means of applying force or fear...To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary....
\*\*\*
Applying these standards, we find no abuse of discretion because the gang evidence was relevant on the issues of motive, intent, and defendant's credibility and was not so extraordinarily prejudicial that it threatened to sway the jury's verdict. (People v. Hernandez supra, 33 Cal.4th at pp. 1049, 1051).

Evidence of the charged offenses shows that an unarmed and unsuspecting middle age couple wandered into an apartment complex in an area where they used to live 25 years earlier. They were looking for their teenage daughter who had run away from home. Their property was taken and two witnesses told them to forget about their property. Then the Cherms continued their search, they were approached and surrounded by a group of males who engaged in a violent and unprovoked attack or "beat down' of the couple. By denying he assaulted Seeva and testifying he hit Steven in self-defense, defendant placed his identity, intent, and credibility, in issue.

As the trial court found, without the gang evidence, these beatings appeared random and senseless as did the eye witnesses' reaction to the theft, namely to "write it off." Evidence that gangs commit "beat downs" to create fear and intimidation and that older members order younger members to commit such offenses to prove their loyalty was relevant to explain the modus operandi and motive for the beatings. Evidence that gangs recruit boys to the gang was relevant to explain how defendant could order this group to cooperate in the attack and why Terrance participated in it. Evidence that a gang member who snitches can expect severe retribution explained the inconsistencies between his trial testimony and his prior statements to the officers. Thus, the gang evidence allowed the jury to properly evaluate the credibility of the Cherms' testimony that defendant attacked them without provocation and weigh their testimony against defendant's testimony that he acted in self-defense.

Nor was the evidence of the prior convictions suffered by defendant, Yerger, and Fields prejudicial. That evidence was offered to prove the gang enhancement element of "pattern of gang activity" and the jury was so instructed. As to defendant, Stoops testified he was convicted of the sale of cocaine base. However, that evidence was also properly admitted to impeach his credibility on cross-examination (Cal. Const., art. I, § 28, subds. (d) and (f); Evid. Code, § 788; People v. Castro (1985) 38 Cal.3d 301, 317), and defendant does not claim it was

14

>erroneously introduced for that purpose.
>
>The prior convictions pertaining to Yerger and Fields were not the same offenses as those charged herein, they were not of a particularly inflammatory nature, there was no evidence defendant was personally involved in any of them, and no details were elicited about them.  Thus, for the same reason these predicate offenses were not relevant to the charged offenses, they also were not prejudicial and there was no danger the jury would be confused or seek to punish defendant for the predicate offenses rather than the charged offenses.

Court of Appeal Opinion (part no published) at 13-16.

        The undersigned especially focuses in on the relevance of the gang testimony to rebut petitioner's allegation of self-defense to the charged general intent crimes.  Despite the fact that it might well seem odd to a trier of fact that petitioner and his allies had brass knuckles at the ready just in case they were attacked, petitioner persisted in his self-defense claim – that petitioner was attacked by the husband and wife out of prejudice and foolhardiness.  Ridiculous as this assertion might have been in the context of the case facts as a whole, the prosecution had a right to rebut it.  Even if viewed only in retrospect, and assuming that the prosecution was oblivious when putting on its case to the story petitioner would weave, the gang evidence directly challenged the self-defense claim by clearly painting petitioner and his cohorts as the cowardly aggressors – a fact that obliterated the self-defense theory.  The defense had an opportunity to relate to the judge when arguing his motion that petitioner would not put on a self-defense case.  When the defense did not do so, the prosecution had a right to assume that this defense, desperate as it might appear, was a potential defense which had to be challenged.

        And, as observed by the Court of Appeal, the predicate offenses used to prove the gang enhancement were not inflammatory.  It cannot be said, that in light of the relevance of the gang evidence to the case itself, failure to bifurcate the gang enhancement evidence put unduly prejudicial evidence before the jury.

        It cannot be said, in reviewing the gang evidence issue, that the Court of Appeal or the trial court unreasonably applied any established Supreme Court authority.

\\\\\

*Conclusion*

The application for writ of habeas corpus is denied. The Clerk is directed to enter judgment in favor of respondent Jauquez.

Should petitioner appeal, a COA is granted as to the double jeopardy issue, but denied as to the gang enhancement bifurcation issue.

DATED: 01/08/10

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
jenk3082.ord